UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MAWULI M. TOVIHLON, <br><br> Plaintiff, <br><br> v. <br><br> ALLIED AVIATION, INC., <br> JAMES BUCHANAN, JIM SIVIA, and RICK WILLIAMS, <br><br> Defendants. | Civil No. 15-315 (RCL) <br><br> *consolidated with* <br><br> Civil No. 15-575 (RCL) |

## MEMORANDUM OPINION

Before the Court is the motion of defendants Allied Aviation, Inc. ("Allied"), James Buchanan, Jim Sivia and Rick Williams ("defendants") for summary judgement.[1] ECF No. 75. Upon consideration of the pleadings, the relevant law, and entire record of the case, the Court **GRANTS** the defendants' motion and the case is hereby dismissed.

### I. BACKGROUND[2]

*A. 2010 Incidents*

Plaintiff, Mawuli M. Tovihlon, began working at Allied on January 5, 2009. Allied is an independently owned and operated company whose core business is providing fueling services for the commercial aviation industry. Allied provides services at airports across the United States, including Reagan Airport, where the plaintiff worked for the entirety of his employment with

---

[1] Defendants Buchanan, Sivia, and Williams do not raise in their motion the issue as to whether they—as individuals—are even proper defendants in a Title VII action. The Court will, therefore, not address the issue as it would have no effect on the outcome of the case.

[2] For this section, the Court draws upon the defendants' statement of uncontested facts and the plaintiff's response.

1

Allied. On May 11, 2009, after a four-month probationary period, the plaintiff was promoted to Lead Mechanic and assigned the overnight shift. The plaintiff was supervised, at least in part, by defendant Rick Williams. Plaintiff's responsibilities as a mechanic and lead mechanic involved fixing trucks, maintaining equipment, maintaining the fuel pits, and repairing buses for Fairfax County. While employed with Allied, Plaintiff was a member of the International Association of Machinists and Aerospace Workers ("IAMAW"), AFL-CIO, Air Transport District Lodge 142, Local Lodge No.1747 (the "Union").

The first confrontation described by the parties occurred in or about March 2010. The parties dispute certain aspects of the interaction, but at a minimum both provide that it related to a work-performance issue. Defendant Williams confronted the plaintiff regarding the method he employed for fixing a van. After this first incident, there was no write-up or disciplinary charges filed against the plaintiff. The plaintiff alleges that around this time he heard Mr. Williams state to Mr. Wyatt and Mr. Sivia—fellow supervisors at Allied—that "he cannot work with an African Negro every day and he cannot deal with Tovihlon" and that all three laughed in response to the comment. ECF No. 77 at 7. The defendants deny any such comments were made and the plaintiff provides no corroborating evidence beyond his own deposition.

In or about April 2010, Mr. Williams again confronted the plaintiff regarding his work performance and provided him with a written warning. ECF No. 75-12 at 2. He noted that the plaintiff "was signing off on hydrant pits checks as being ok, when in fact pit lid seals were off the lids, flange bolts missing, and bad hinges." *Id.* The plaintiff lost no pay, benefits or status because of the written warning. The plaintiff does not deny that he failed to report hydrant pit issues, but rather notes that he did so at the direction of Mr. Sivia.

2

Within three days of receiving the written warning, the plaintiff submitted a complaint to Allied management. ECF No. 75-13 at 2. In it, he alleged that Mr. Williams "harassed" him, "put[] pressure on [him]," and treated him poorly. In response to the allegations, Allied investigated and held a meeting on April 21, 2010. The meeting was attended by the plaintiff, Allied management, and union representatives. As outlined in Mr. Sivia's meeting notes—transcribed around the time of the meeting—the attendees discussed the plaintiff's work performance. They also discussed the allegation that Mr. Williams had harassed the plaintiff, with the plaintiff only citing the March 2010 incident. The plaintiff denies that he only provided one example at the meeting of Mr. Williams harassing him and cites numerous incidents of "mistreatment and harassing actions" in his brief. ECF No. 77 at 11. However, the plaintiff does not argue that he raised any of those incidents at the meeting on April 21. In any event, the meeting ended with Mr. Williams agreeing to "adapt his tone of voice" when addressing the plaintiff and the plaintiff was asked "to be less sensitive" to Mr. William's tone of voice.

On August 27, 2010, Mr. Williams provided the plaintiff with a statement of charges of poor work performance for "failure to check water level in the buses on the bus checks." ECF No. 75-16. Soon after receiving the report, the plaintiff filed a complaint with his union representatives and alleged that Mr. Williams continued to harass him. Specifically, he noted that Mr. Williams

> discriminate[s] the way he treats people at work. He always looking for something to accuse people of doing when he himself make a lot of mistake and damage thing at work, And no One say Anything about that; He uses He [sic] position to harass me At work put pressure on me and do not let me focus on the work I have to do….

ECF No. 75-17 at 2. The plaintiff makes no allegation in the written complaint to racial or national origin discrimination. *Id.* The plaintiff did not receive a response to his complaint from the union.

**B.    2011 Incidents**

3

In or around February 28, 2011, Allied discovered that the plaintiff's Employment Authorization Card expired on November 20, 2010, and no new documentation had been submitted demonstrating that he was authorized to work in the United States. The plaintiff was, therefore, advised that he was suspended until the appropriate documentation was provided. After consultation with an attorney, it became clear that because the plaintiff was applying for a green card, no new work permit would be issued, but he was authorized to work. He was reinstated the following day and was paid for the single day he did not work.

In the Spring of 2011, the plaintiff was involved in two separate altercations with Allied employees. The parties dispute the nature of the altercations, but what is uncontested is that one Allied employee submitted a hand-written complaint to management stating that he was "threatened by the [plaintiff] saying he is going to put me in the hospital." ECF No. 75-20. Mr. Williams attempted to convince the other employee to also file a written complaint against the plaintiff, but the employee refused. ECF No. 75-21 at 2.

One week later, on June 6, 2011, the plaintiff submitted another complaint to management regarding Mr. Williams's continued harassment and discrimination against him. ECF No. 75-22. As with the previous complaints, the letter centers on Williams's attempts to "falsely accuse[]" the plaintiff of "poor work performance." *Id.* The plaintiff further alleged that Williams coerced Allied employees to file false reports against him. *Id.* The plaintiff made similar allegations in a grievance form filed with his union on June 13, 2011. ECF No. 75-23 at 2-3. Neither the letter nor the grievance form contain allegations of discrimination on the basis of race or national origin.

Mike Baylor, an Allied operations manager, investigated the allegations and ultimately concluded "that the issues stemmed for personality conflicts and found that there was no discrimination or harassment"—a conclusion disputed by the plaintiff. ECF No. 75-1 at 16. At

no point during a meeting held throughout the course of the investigation did the plaintiff allege that he was discriminated against based on race or national origin.

The next month, on July 5, 2011, the plaintiff filed a charge with the NLRB, alleging that Allied supervisors "harassed" him "by soliciting false statements against him because of activities in behalf of the [union]." ECF No. 75-26 at 5. In the twenty-six-page written affidavit submitted to the NLRB, the plaintiff detailed all of his prior complaints with Mr. Williams and Allied management. However, he made no mention of any discrimination on the basis of race or national origin. Nor did he describe any discriminatory comments made about him. Following an investigation, the NLRB dismissed the charge finding that the "evidence failed to establish that the Employer solicited false statements from employees." ECF No. 75-6 at 2. The plaintiff's subsequent appeal was also denied.

On December 11, 2011, the plaintiff submitted his first complaint to the Equal Employment Opportunity Commission ("EEOC"). He outlined "ongoing harassment" by his employer and alleged that Mr. Williams used a derogatory slur against him, referring to him as an "African Nigger." ECF No. 75-31 at 2-3. The EEOC investigated whether the plaintiff was "harassed, and subjected to disparate treatment because of [his] race (black), [his] national origin (African), and in retaliation for complaining of discriminatory treatment." ECF No. 75-8. On December 9, 2014, the EEOC found that the "evidence appears to show the employer had a legitimate nondiscriminatory reason for its job actions and fails to support your allegations of race and national origin discrimination." ECF No. 75-8 at 2. The EEOC further remarked that "[t]he evidence does not appear to show an adverse job action was taken against you. The evidence does appear to show the employer had a legitimate non-discriminatory reason for taking the job action it took and fails to support your allegation of retaliation." *Id.*

5

### C. Plaintiff's Termination in 2013

On August 14, 2013—over a year and a half after the plaintiff filed his EEOC complaint—an incident occurred between the plaintiff and Shawn Wyatt, an Allied supervisor. Following the plaintiff's night shift work, Wyatt reviewed his paperwork and noted that he needed a more precise time breakdown on the lead sheets. ECF No. 75-34. The ensuing conversation, which became heated, lasted 10 minutes and was recorded by the plaintiff. A copy of the recording was eventually provided to the defendants and the Court.

The plaintiff was provided with a notice of a code of conduct violation for "insubordination." ECF No. 75-35 at 2. The plaintiff refused to sign the notice. *Id.* Plaintiff noted that he refused to sign because Wyatt was intoxicated and harassed him. ECF No. 77 at 22.

That same day, the plaintiff submitted a written complaint in which he alleged increasing retaliation against him. He made a number of allegations against Shawn Wyatt, including that Wyatt "abus[ed]" him and falsely accused him of things. ECF No. 75-36 at 2. He further asserted that Wyatt shouted at him to "shut up" and cursed at him. Specifically referencing the incident of the precious day, he provided that Wyatt "reported to work drunk" and cursed "fuck you" to him. *Id.*

Allied promptly investigated the incident. The plaintiff initially refused Allied's request for the audio recording. Allied ultimately concluded, based on statements provided by other employees, that the plaintiff was in fact insubordinate and that his allegations that Wyatt was intoxicated and that he used profane language were unfounded. Allied placed the plaintiff on administrative leave and informed him that he had roughly one week to submit a copy of the audio recording. ECF No. 75-39 at 2.

At a meeting on August 27, the plaintiff played the audio recording for Allied management and union representatives. Upon determining that Mr. Wyatt did not curse at the plaintiff, that the plaintiff had indeed been the initial aggressor, and that the recording failed to substantiate his claims, Allied upheld its decision to terminate the plaintiff.

On December 4, 2013, the plaintiff filed a complaint alleging retaliation with the D.C. Office of Human Rights. In response, the D.C. Office of Human Rights noted that the complaint was being transferred to the EEOC because it did not have jurisdiction since all of the alleged discriminatory acts occurred at Reagan Airport, which is located in Virginia. By the end of December 2014, the EEOC informed the plaintiff that it had found no violation of any statute and issued right to sue notices on each of the plaintiff's charges.

### D.  *Procedural Background*

On March 3, 2015, the plaintiff filed a complaint under Case No. 15-cv-315, relating to EEOC Charge No. 10C-2014-00042. On April 15, 2015, the plaintiff filed a related action under Case No. 15-cv-575, referencing EEOC Charge No. 570-2012-00450. On May 20, 2015, the defendants moved to dismiss both actions. The plaintiff moved to amend his complaints. The Court granted the motion to amend, denied the defendants' motions as moot and consolidated the actions.

On September 17, 2015, Plaintiff filed an amended complaint for the consolidated actions, asserting seven causes of action against the defendants: (1) race discrimination in violation of Title VII of the Civil Rights Act; (2) national origin discrimination in violation of Title VII of the Civil Rights Act; (3) retaliation in violation of Title VII of the Civil Rights Act; (4) race discrimination in violation of the D.C. Human Rights Act; (5) national origin discrimination in violation of the D.C. Human Rights Act; (6) retaliation in violation of the D.C. Human Rights Act; and (7)

7

wrongful discharge in violation of public policy. *See* ECF No. 20. The defendants filed an answer to the amended complaint and the parties commenced discovery. The Court now considers the defendants' motion for summary judgment on all seven counts.

## II. SUMMARY JUDGMENT STANDARD

Under Rule 56, summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). "A fact is material if it 'might affect the outcome of the suit under the governing law,' and a dispute about a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Steele v. Schafer*, 535 F.3d 689, 692 (D.C. Cir. 2008) (quoting *Liberty Lobby*, 477 U.S. at 248). All inferences drawn from the facts must be viewed in the light most favorable to the non-moving party. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970). To prevail on a summary judgment motion there must be enough evidence on which the jury could reasonably find for the moving party. *Id.* at 252. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 248. (internal citations omitted). Summary judgment is also appropriate when, "after adequate time for discovery," the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## III. DISCUSSION

  A. *Title VII Claims For Discrimination Based on Race or National Origin—Counts 1 and 2*

In his amended complaint, the plaintiff alleges that the defendants discriminated against him in violation of Title VII due to his race as an African American (Count 1) and his national origin as an immigrant from Togo (Count 2).

1. **Legal Standard**

Federal employment discrimination is prohibited by Title VII of the Civil Rights Act of 1964, under which it is unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

Title VII claims are analyzed under the burden-shifting framework found in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under *McDonnell Douglas*, the employee "must carry the initial burden under the statute of establishing a prima facie case of racial discrimination." *Id.* at 802. In cases concerning disparate treatment based on national origin, race, or sex, a *prima facie* case consists of a showing that "(1) [the plaintiff] is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination." *Chappell-Johnson v. Powell*, 440 F.3d 484, 488 (D.C. Cir. 2006) (internal quotation marks omitted).

If the employee establishes a prima facie case of discrimination, the burden "must shift to the employer to articulate some legitimate, nondiscriminatory reason for the" adverse action. *McDonnell Douglas*, 411 U.S. at 802. The employer "must clearly set forth, through the introduction of admissible evidence, the reasons for the [the action]" so as to "raise[] a genuine issue of fact as to whether it discriminated against the plaintiff." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254–55 (1981).

If the employer succeeds in offering legitimate, nondiscriminatory reasons for the action, the "plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons but were a pretext for discrimination." *Id.* at 252. The plaintiff may demonstrate pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.* at 255. Either way, the plaintiff must show "*both* that the reason was false, *and* that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993). Evidence of pretext may include "the employer's better treatment of similarly situated employees outside the plaintiff's protected group, its inconsistent or dishonest explanations, its deviation from established procedures or criteria, or the employer's pattern of poor treatment of other employees in the same protected group as the plaintiff, or other relevant evidence that a jury could reasonably conclude evinces an illicit motive." *Walker v. Johnson*, 798 F.3d 1085, 1092 (D.C. Cir. 2015).

**2. Analysis**

The plaintiff now argues, in his opposition brief, that the defendants "wrongly applie[d] the McDonald Douglass (sic) burden shifting framework" in its motion for summary judgment. ECF No. 77 at 34. Instead he asserts that his Title VII claims relate to a hostile work environment theory of recovery, not discrimination based on an adverse employment action. Despite that contention, the Court will still first analyze the claims under the *McDonnell Douglas* framework for the sake of completeness before returning to the plaintiff's allegation that the defendants created a hostile work environment.

Here, the plaintiff has failed to make out a *prima facie* case for discrimination. First off, the evidence only establishes one adverse employment action—the plaintiff's termination on

August 27, 2013. None of the prior incidents—described in the background section of this opinion—rise to the level of an adverse employment action. An adverse action is defined as "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits." *Jones v. Castro*, 168 F.Supp.3d 169, 178 (D.D.C. 2016). The D.C. Circuit has made clear that "'formal criticism or poor performance evaluations are [not] necessarily adverse actions' and they should not be considered such if they did not 'affect[] the [employee's] grade or salary.'" *Taylor v. Small*, 350 F.3d 1286, 1293 (D.C. Cir. 2003) (quoting *Brown v. Brody*, 199 F.3d 446, 457–58 (D.C. Cir. 1999)).

At no point until his ultimate termination was the employee's employment status adversely affected. He was not demoted, docked pay, deprived of benefits, or denied a promotion as a result of any of the incidents. He was paid for the day that he was asked to stay home because of the immigration status issue. *Cf. Baloch v. Kempthorne*, 550 F.3d 1191, 1199 (D.C. Cir. 2008) (*quoting Whittaker v. N. Ill. University,* 424 F.3d 640, 647 (7th Cir.2005) ("[A] suspension *without pay* that is never served does not constitute an adverse employment action.") (emphasis added)). And the negative performance reviews and criticism he received did not result in any formal disciplinary charges.

As such, the only adverse employment action cited by the plaintiff which may be actionable under Title VII is his termination in August 2013. But the plaintiff fails to demonstrate why the termination "gives rise to an inference of discrimination"—the third prong of the *prima facie* test. Even if the Court accepts the plaintiff's contention that defendant Williams used a racial slur in reference to the plaintiff in March 2010, that incident still occurred approximately three and a half

11

years prior to the plaintiff's termination.[3] The record does not reflect any other discriminatory acts based on race or national origin between the alleged March 2010 incident and the plaintiff's termination. Accordingly, that act was too remote to give rise to an inference of discrimination. *See Ng v. Lahood*, 952, F.Supp.2d 85, 96-97 ("In sum, assuming that Ng suffered any adverse employment actions, the record is devoid of any evidence connecting the alleged adverse employment actions that Ng identifies to his race or national origin. This failure constitutes a second, independent basis upon which summary judgment must be granted for Defendant.") Moreover, there is no evidence that defendant Williams played any role in the plaintiff's termination. He was not present for the incident with Shawn Wyatt in August 2013, nor was he involved in the ensuing investigation and termination process.

Even if the Court assumes that the plaintiff demonstrated a *prima facie* case for discrimination based on race and national origin, the defendants have offered legitimate, nondiscriminatory reasons for their actions. The defendants claimed to have terminated the plaintiff for insubordination—which is a violation of Allied's Code of Conduct—and lying during the ensuing investigation. The Court finds that these reasons are substantiated by the evidence.

---

[3] The defendants would have the Court disregard that incident—or any incident prior to February 15, 2011—in its analysis because it occurred outside the strict statute of limitations period under Title VII. The statute requires that plaintiffs "file an employment discrimination charge with the EEOC either 180 or 300 days after an 'alleged unlawful employment practice occurred.'" *Akonji v. Unity Healthcare, Inc.*, 517 F. Supp. 2d 83, 90 (D.D.C. 2007) (*citing* 42 U.S.C. §2000e 5(e)(1)). And that failure to file a charge within 300 days of the alleged act of retaliation or discrimination precludes the plaintiff from being able to recover for that act. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110 (2002). Here, the defendants contend that since the plaintiff filed his first charge with the EEOC on December 12, 2011, any incidents prior to February 15, 2011—300 days earlier—must be precluded from consideration. The plaintiff posits that the incidents may be considered under the continuing violation doctrine, which applies to hostile work environment claims. But the Court does not need to resolve this issue because even when considering the prior incidents, the defendant is entitled to judgment as a matter of law on all Title VII claims. At a minimum though, it seems clear that the prior incidents should not be considered except in the context of the hostile work environment claims.

The recording from the August 14, 2013, confrontation demonstrates that the plaintiff raised his voice with Shawn Wyatt and that Wyatt did not tell the plaintiff to "shut up" and "fuck you" as the plaintiff claimed during the internal Allied investigation. ECF No. 75-34 (transcript); Exhibit DD (audio recording). While Wyatt also raised his voice during the altercation, there is no evidence that he "harassed" the plaintiff or cursed at him. On top of that, the recording makes clear that the plaintiff was not truthful in his subsequent complaint to management. In light of all that, Allied has certainly proffered a legitimate, nondiscriminatory reason for its action. With the burden shifting back to him, the plaintiff offers up no evidence to establish that the reasons were mere pretext. Absent the racial slur allegedly made by Mr. Williams in March 2010—which the Court notes the plaintiff did not mention in any of his various written complaints made between March 2010 and December 2011—the plaintiff points to no other facts indicating that Allied discriminated against him based on race and/or national origin.

The Court now turns to the plaintiff's allegation that the defendants created a hostile work environment in violation of Title VII. The defendant argues that the plaintiff's claim fails on a threshold ground as he did not exhaust his administrative remedies at the EEOC for the hostile work environment claim. In *Park v. Howard* University, the D.C. Circuit made clear that a "Title VII lawsuit following the EEOC charge is limited in scope to claims that are like or reasonably related to the allegations of the charge and growing out of such allegations." 71 F.3d 904, 907 (D.C. Cir. 1995) (internal citation and quotation marks omitted). At a minimum, the Title VII claims must arise from "the administrative investigation that can reasonably be expected to follow the charge of discrimination." *Id.* (internal citation and quotation marks omitted). The administrative charge requirement is not meant to be a heavy technical burden on the movant, but "the requirement of some specificity in a charge is not a mere technicality" and a "court cannot

allow liberal interpretation of an administrative charge to permit a litigant to bypass the Title VII administrative process." *Id.* (internal citation and quotation marks omitted).

While the plaintiff's EEOC charge on December 12, 2012 lacks the words "hostile work environment" it does contain "factual allegations supporting such a claim." *Id.* at 908. The plaintiff alleged that he was "subjected to various incidences of harassment, intimidation, retaliation, mental stress, demoralizing innuendo, racial and bigoted slurs (i.e. "I don't want to deal with an African Nigger....)" ECF No. 75-31 at 3. A hostile work environment investigation can reasonably follow from those allegations. Accordingly, the Court will not dismiss on exhaustion grounds.

Despite exhausting his administrative remedies, the plaintiff has not established a prima facie case for hostile work environment in the present lawsuit. To state a prima facie case of hostile work environment, a "plaintiff must show that (1) he is a member of a protected class, in this case a 'qualified individual with a disability;' (2) he was subject to unwelcome harassment; (3) the harassment occurred because of his [race or national origin]; (4) the harassment affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment, but took no action to prevent it." *Pantazes v. Jackson*, 366 F.Supp.2d 57, 71 (D.D.C. 2005). A workplace only becomes hostile if it "is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment....'" *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal citations omitted).

As the Court has already discussed, the record is devoid of facts indicating that the defendants harassed the plaintiff based on his race or national origin. Plaintiff points to a single comment from March 2010 made by a supervisor not involved in his ultimate termination. Absent

14

any additional facts, the plaintiff falls short in meeting his burden to make out a *prima facie* case of hostile work environment. For all the reasons stated herein, the Court finds that there are no disputes as to any materials facts related to the first and second causes of action and that the defendants are entitled to judgment as a matter of law. The counts must be dismissed.

### B. *Claim For Retaliation under Title VII—Count 3*

Retaliation claims are evaluated using the same burden-shifting framework as claims of discrimination. *Holcomb v. Powell,* 433 F.3d 889, 901 (D.C. Cir. 2006). "To establish a prima facie case of retaliation, the plaintiff must present evidence that (1) she engaged in activity protected by Title VII; (2) the employer took adverse employment action against her; and (3) the adverse action was causally related to the exercise of her rights." *Id.* The D.C. Circuit has held that "close temporal relationship may alone establish the required causal connection." *Singletary v. District of Columbia,* 351 F.3d 519, 525 (D.C. Cir. 2003) (citing *Cones v. Shalala,* 199 F.3d 512, 521 (D.C. Cir. 2000)). If the plaintiff meets the burden of establishing a prima facie case, "the employer must articulate a legitimate nonretaliatory reason for its action," and "finally, the plaintiff has the ultimate burden of establishing that the reason asserted by the employer is pretext for retaliation." *Holcomb,* 433 F.3d at 901.

As the Court has established, the only adverse employment action against the plaintiff was his termination in August 2013. The plaintiff filed his first EEOC charge—conduct that clearly constituted protected activity—on December 11, 2011. From that date until the dispute with Shawn Wyatt, the plaintiff made no other complaints to his union, Allied management, or the EEOC that would constitute protected activity. Therefore, more than 600 days elapsed between the protected activity and the adverse employment action. That period of time is simply too lengthy to support a causal connection between the alleged retaliatory act and the protected

15

activity. *See Asare v. LM-DC Hotel, LLC*, 62 F. Supp. 3d 30, 35 (D.D.C. 2014) (finding that a year and a half gap between the alleged complaint and termination was insufficient to demonstrate a causal connection because "[t]he temporal proximity between a discrimination complaint and an adverse employment action, however, must be 'very close' to show a causal connection where no direct evidence is present."). In his opposition brief, the plaintiff contends that the defendants incorrectly rely "on the first charge with the EEOC on December 12, 2011 as the only protected activity that the plaintiff participated in." ECF No. 77 at 40. But he then goes on to cite additional "protected activity" that all *predated* the first EEOC charge. *Id.* at 41-42. His argument is, therefore, meritless as he fails to assert a single act of protected activity closer in time to the adverse employment action than the EEOC charge in December 2011.

Even if the Court assumes that the plaintiff has established a *prima facie* case for retaliation, the claim is infirm for the same reasons that the Title VII discrimination claims fail. The defendants have established legitimate nonretaliatory reasons for their action—insubordination and lying during the ensuing investigation—and the plaintiff has not demonstrated those reasons to be pretextual. Accordingly, the plaintiff's third cause of action must be dismissed as a matter of law.

### C. Claims Under the D.C. Human Rights Law—Count 4-6

Counts four through six of the plaintiff's amended complaint are all brought under the D.C. Human Rights Law. The counts must be dismissed for a very simple reason. All of the actions that the plaintiff alleges constitutes discrimination occurred at Reagan Airport, which is located in Virginia and beyond the jurisdiction of the D.C. Human Rights Law. *See Monteilh v. AFSCME, AFL–CIO*, 982 A.2d 301, 304 (D.C. 2009) (Jurisdiction exists under the DCHRA when the "actual discriminatory ... decisions by an employer ... [took] place in the District" or when the employee

16

experienced the effects of the discrimination in the District.); *Calobrisi v. Booz Allen Hamilton, Inc.*, 58 F. Supp. 3d 109, 114 (D.D.C. 2014).

The plaintiff worked at all times at Reagan Airport and is a resident of Maryland. The plaintiff contends that because defendant Allied maintains an office in the District of Columbia, decisions relating to the plaintiff must have taken place in the District of Columbia. But the plaintiff offers up no admissible evidence in support of that allegation. Without any evidence that discriminatory decisions took place in the District, the plaintiff's causes of actions must be dismissed as a matter of law. The D.C. Office of Human Rights arrived at the same conclusion regarding jurisdiction and the Court sees no reason to come out differently.

### D. *Claims For Wrongful Termination Due to Public Policy—Count 7*

The Court arrives at the plaintiff's seventh, and final, cause of action in his amended complaint. He alleges that Allied wrongfully discharged him in violation of public policy, noting that the "District of Columbia recognizes a public policy exception to the at-will employment doctrine." ECF No. 30, ¶ 252. As an initial matter, since the record establishes that all actions occurred within Virginia, D.C. law would not apply. That aside, the plaintiff's claim fails for another independent reason. The D.C. Court of Appeals noted that "[i]t seems to be universally accepted that an employer's discharge of an employee for the employee's refusal to violate a statute is a wrongful discharge in violation of public policy." *Adams v. George W. Cochran & Co.*, 597 A.2d 28, 32 (D.C. 1991). Here, the plaintiff bases his claim on an incident from March 2010 related to his inspection of the hydrant pits. ECF No. 20, ¶¶ 260-65. He alleged that defendant Sivia ordered him to falsify documents related to the state of the hydrant pits. Even if the Court construes this fact in favor of the plaintiff, there is absolutely no evidence linking that incident to the plaintiff's eventual termination in August 2013. Therefore, the public policy exception to the

17

plaintiff's at-will employment relationship is inapplicable to this case and the claim must be dismissed as a matter of law.

## IV. CONCLUSION

For the reasons stated herein, the Court **GRANTS** the defendants' motion for summary judgment, ECF No. 75. The case is hereby **DISMISSED**. A separate Order accompanies this Memorandum Opinion.

It is **SO ORDERED.**

Date: August 29, 2018

Royce C. Lamberth
United States District Judge